## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| Terrence Galloway, (R22244), | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Case No. 18 C 2723 |
| v. | ) | |
| | ) | Judge John J. Tharp, Jr. |
| | ) | |
| Jacqueline Lashbrook, Warden, | ) | |
| Menard Correctional Center,[1] | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

Petitioner Terrence Galloway, an inmate at the Pinckneyville Correctional Center, brings this *pro se* habeas corpus action pursuant to 28 U.S.C. § 2254 challenging his first degree murder, attempted first degree murder, and aggravated battery with a firearm convictions from the Circuit Court of Cook County. The Court denies the petition on the merits and declines to issue a certificate of appealability.

## I.    Background

The Court draws the following factual history from the state court record (Dkt. 65, 73-1) and state appellate court opinion, *Illinois v. Galloway*, 2014 IL App (1st) 122942-U ("*Direct Appeal*"). State court factual findings, including facts set forth in a state court appellate opinion, have a presumption of correctness, and Petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C § 2254(e)(1); *Tharpe v. Sellers*, 138 S. Ct. 545, 546

---

[1] Petitioner is now located at the Pinckneyville Correctional Center in the custody of Warden David Mitchell. The Court substitutes Warden Mitchell in place of the named Respondent Warden Lashbrook. *See Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004) (explaining proper Respondent in habeas corpus case is prisoner's immediate custodian such as his warden); Fed. R. Civ. 25(d) (allowing for automatic substitution of public official named in official capacity).

(2018); *Hartsfield v. Dorethy*, 949 F.3d 307, 309 n.1 (7th Cir. 2020) (citations omitted). Petitioner has not made such a showing.

The victim, Stacy Adams, was shot and killed on the evening of October 9, 2009, while standing in the 700 block of North Harding Avenue in Chicago's Garfield Park neighborhood. *Direct Appeal*, 2014 IL App (1st) 122942-U, ¶ 4. He was with Randall Knox and David Etheridge immediately before the shooting. *Id*. at ¶ 16. Both Knox and Etheridge, who was also shot but survived the incident testified for the prosecution at trial. *Id*. at ¶¶ 16, 19.

Both men related that at approximately 8:30 p.m. on the evening of the murder, they were hanging out with the victim when two men approached their group. *Id*. They recognized one of the approaching individuals as a man named "Q," but they did not know the second person. *Id*. Both Knox and Etheridge subsequently identified Petitioner as the second man with Q. *Id*. Knox identified Petitioner via a subsequent police photo array and during his in-court testimony at trial, *id*. at ¶ 16, while Etheridge identified Petitioner in both a police lineup and his in-court trial testimony. *Id*. at ¶ 20; (Dkt. 65-14, pg. 104.).

Knox and Etheridge explained that Petitioner was wearing a hooded sweatshirt and had his hands in his pockets as he and Q approached. *Direct Appeal*, 2014 IL App (1st) 122942-U, ¶¶ 16, 19. Seeing the oncoming men, Knox began retreating and was standing in the street about twelve feet away when Petitioner and Q confronted the victim and Etheridge. *Id*. at ¶ 16. He saw Petitioner pull out a gun. *Id*. At this point, Knox turned and ran. *Id*. Knox estimated he was 20 steps away from the group when he heard gunshots. *Id*. He stopped running when he reached the parking lot at Orr High School approximately one block from the shooting. *Id*. Knox witnessed the police arrest Petitioner outside the high school immediately after the shooting. *Id*.

2

Knox conceded at trial that he did not immediately speak to the police about the shooting, and did so only after he was arrested on an unrelated matter a month later. *Id*. at ¶ 17. He was on probation for a narcotics conviction at the time of the arrest, and those charges were later dropped. *Id*.

As for Etheridge, he testified that he remained standing next to the victim as Petitioner and Q approached. (Dkt. 65-14, pgs. 100.) Petitioner and Q were approximately three feet from Etheridge and the victim when Petitioner said "what's up" to the victim. *Id*. at 99. The victim did not respond, but Etheridge testified that he said, "nigger, what's up" to Petitioner and Q. *Id*. at 100. Etheridge witnessed Petitioner pull out a gun and saw a flash as the gun was discharged. *Direct Appeal*, 2014 IL App (1st) 122942-U, ¶ 19. He fled and eventually realized he had been shot in the shoulder. *Id*. at 20.

Etheridge ran home and was taken to the hospital by ambulance. *Id*. He lied to the paramedics about the circumstances of his injury. *Id*. When the police interviewed Etheridge at the hospital, however, they told him that the victim had been killed, prompting Etheridge to tell the police about the shooting. *Id*. He explained that he initially lied because he was frightened and did not know if anyone else was injured. *Id*. After receiving treatment for his injuries, Etheridge went to the police station where he explained what happened and identified Petitioner in a lineup as the shooter. *Id*.

In terms of impeaching Etheridge, the jury heard that the Cook County State's Attorney paid for his meals and hotel room on the weekend prior to his court testimony. *Id*. at ¶ 22. He also acknowledged that he had a pending DUI felony case at the time of his testimony, and that he had two prior felony convictions. *Id*. The defense also brought out that Etheridge had testified before

3

the grand jury that he had gone to a liquor store alone prior to the shooting, but at trial he said others had gone with him. *Id*. His grand jury testimony also implied that he may have started running before any shots were fired, but he stated unequivocally at trial that he was shot and then he ran. *Id*.

A third eyewitness, Xavier Miller, also testified for the prosecution. *Id*. at ¶ 18. Miller's mother had been the victim's foster mother and the two men had known each other for seven or eight years before the shooting. *Id*. Miller was at a friend's home on the block where the shooting occurred that evening. *Id*. He was standing at a third-floor window overlooking the street when he heard a commotion and voices getting louder on the street. *Id*. Miller then heard three gunshots. *Id*. He witnessed three men then run off, two going south and the other going north on the street. *Id*. Miller did not see the faces of the men running or a gun, but he did see the victim fall to the street. *Id*. He went down the home's stairs but did not move quickly due to a gunshot wound to his foot from a prior unrelated incident. *Id*. Upon exiting the building, Miller saw Petitioner wearing a black hooded sweatshirt running through a vacant lot towards Orr High School with a black object in his hand. *Id*. Miller also saw Petitioner in the back of a police car later that evening. *Id*. He both identified Petitioner in a police station lineup and during his in-court testimony. *Id*.; (Dkt. 65-14, pg. 77.) Miller conceded during his testimony that he had five prior felony convictions. *Direct Appeal*, 2014 IL App (1st) 122942-U, ¶ 18.

At the time of the shooting, Chicago police officers Bottom, O'Brien, and Stanula were conducting an unrelated traffic stop one block away from the location of the shooting. *Id*. at ¶¶ 6, 23. Officers O'Brien and Stanula testified regarding their arrest of Petitioner. *Id*. at ¶¶ 7-9, 23. The officers explained they heard three loud gunshots and Officers O'Brien and Stanula got into their

squad car and headed in the direction of the shots. When they saw two men in hooded sweatshirts run by, Stanula jumped out of the car and followed them on foot. Dkt. 65-15 at 8-10; *Direct Appeal* at ¶¶ 7, 9, 23. O'Brien continued in the direction of the shots and saw Petitioner, wearing black jeans and a black hooded sweatshirt, running out of an alley. *Direct Appeal* at ¶¶ 7, 23. Petitioner got into the driver's seat of a parked minivan, and Officer O'Brien responded by pulling his marked police car "nose to nose" with the van. *Id*. Officer O'Brien was able to look directly into the minivan and observed that Petitioner had a goatee. *Id*. O'Brien got out of the squad car with his weapon drawn, identifying himself as a police officer and instructing Petitioner to show his hands. *Id*. Petitioner then jumped out of the van and fled on foot. *Id*. Officer O'Brien gave chase and sent a radio flash message describing Petitioner's appearance. *Id*. He believed Petitioner was armed as he clasped the right side of his waist as he ran. *Id*.

Upon hearing the flash message, Officer Stanula terminated his pursuit and went to assist Officer O'Brien. *Id*. at ¶¶ 9, 23. Officer Stanula came upon Officer O'Brien, who had lost track of Petitioner and informed Officer Stanula of the direction of Petitioner's flight. *Id*. Officer Stanula came upon Petitioner walking on the street. *Id*. He stated "stop, police," to which Petitioner began fleeing through an empty lot. *Id*. Officer Stanula gave chase again. *Id*. While Officer Stanula was approximately 10 to 15 feet behind Petitioner during the chase, Petitioner took a firearm from his waistband and threw the gun up over a fence as he continued to run. *Id*. Officer Stanula eventually caught up to Petitioner outside of Orr High School and arrested him. *Id*. Petitioner had thrown the gun over a locked fence at a ComEd power facility. *Id*. at ¶ 23. Other police officers were eventually able to access the facility and recovered the gun. *Id*.

Subsequent forensic testing matched bullet fragments taken from the victim's body during an autopsy to the firearm recovered at the ComEd facility. *Id*. at ¶ 26. Gunshot residue was found on the right cuff of Petitioner's sweatshirt, but no residue was found on Petitioner's hands. *Id*. An expert explained that residue can be removed from a person's hands via activity. *Id*. A small amount of DNA was located on the recovered firearm. *Id*. at ¶ 25. The DNA contained samples from at least two, and potentially up to four, individuals. *Id*. at 26. The forensic scientist who compared Petitioner's DNA to the DNA on the gun testified that Petitioner's DNA could not be excluded from the DNA mixture on the gun. But, she also could not exclude one in every four African Americans, one in every eight Caucasians, and one in every six Hispanics as a possible DNA match. *Id*.

Upon completion of the trial, the jury found Petitioner guilty of the murder of Adams, the attempted murder of Etheridge, and aggravated battery with a firearm. *Id*. at ¶ 27. Petitioner was sentenced to 81 years of imprisonment. *Id*. His convictions and sentence were affirmed by the Appellate Court of Illinois, *id*. at ¶ 60, the Supreme Court of Illinois denied his request for a petition for leave to appeal (PLA), *Illinois v. Galloway*, No. 118092, 20 N.E.3d 1258 (Ill. Sept. 24, 2014) (Table), and the United States Supreme Court denied his petition for a writ of certiorari, *Galloway v. Illinois*, No. 14-7960, 575 U.S. 1556 (Mar. 23, 2015) (Memo.), completing Petitioner's direct appeal.

Following the direct appeal, Petitioner brought a postconviction petition, (Dkt. 65-5.) which was denied by the state trial court. (Dkt. 65-6.) The state appellate court granted Petitioner's appointed appellate counsel's motion to withdraw pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987), and affirmed the denial of the postconviction petition. *Illinois v. Galloway*, 2017 IL

App (1st) 153142-U; (Dkt. 65-2.) The Supreme Court of Illinois denied Petitioner's PLA,

completing the proceedings on his first postconviction petition. *Illinois v. Galloway*, No. 124032

(Ill. Nov. 28, 2018) (Dkt. 65-8, pg. 31.) Petitioner then sought leave to bring a successive state

postconviction petition, but that request was denied. *Illinois v. Galloway*, 2019 IL App (1st)

161592-U, ¶ 23. The appellate court affirmed the denial, *id*. at ¶ 43, and the Supreme Court of

Illinois denied his PLA. *Illinois v. Galloway*, No. 126919, 167 N.E.3d 638 (Ill. Mar. 24, 2021)

(Table). Petitioner now brings this habeas corpus petition before this Court. (Dkt. 1.)[2]

## II.    Analysis

Petitioner advances six grounds for relief in his habeas corpus petition: (1) insufficient

evidence to support his conviction; (2) the state court erred by failing to grant his motion to

suppress the lineup identifications; (3) ineffective assistance of trial counsel; (4) ineffective

---

[2] Petitioner filed the instant habeas corpus petition when his first postconviction appeal was still pending in the state courts. (Dkt. 1.) The Court granted Petitioner a stay of this case so that he could complete his state court proceedings. (Dkt. 17.) Over Petitioner's objection, the Court lifted the stay following the completion of Petitioner's successive postconviction proceedings. (Dkt. 44, 50, 55.) Although Petitioner continued to attempt to bring additional successive postconviction petitions and also filed requests for forensic testing before the state court, this Court saw no reason to reinstate the stay in this case. *Id*. The purpose of a stay is to allow a prisoner to exhaust his available state court remedies without concern that his habeas corpus petition would inadvertently become untimely if the case is dismissed without prejudice for failure to exhaust available state court remedies. *Rhines v. Weber*, 544 U.S. 269, 276-77 (2005). An available state court remedy is one that is through which a prisoner can raise a claim before the state courts under state law. 28 U.S.C. § 2254(c); *Carey v. Saffold*, 536 U.S. 214, 220 (2002). As a general principle, a prisoner may raise claims to the Illinois courts through direct appeal and a postconviction petition. A prisoner cannot bring a successive postconviction petition in Illinois without leave of court. 725 ILCS 5/122-1(f). The Illinois courts rejected his efforts to bring a successive postconviction petition. *Illinois v. Galloway*, 2019 IL App (1st) 161592-U, ¶ 43. Further, a motion for forensic testing under Illinois law only allows a prisoner to obtain testing of evidence, it does not allow him to raise a corresponding claim. *Price v. Pierce*, 617 F.3d 947, 952-53 (7th Cir. 2010). Equally, the claims raised in the instant habeas corpus petition were adjudicated on either direct appeal or first postconviction proceeding. There is, therefore, no reason to delay the resolution of the habeas corpus petition.

assistance of post-trial counsel; (5) ineffective assistance of appellate counsel; and (6) the state court erred in imposing Petitioner's sentence. (Dkt. 1, pgs. 5-6.)

### A.     Claim One:    Sufficiency of the Evidence

Turning to Petitioner's first claim challenging the sufficiency of the evidence supporting his conviction, the last reasoned state court decision addressing the claim on the merits was the direct appeal before the state appellate court, *Direct Appeal*, 2014 IL App (1st) 122942-U, ¶¶ 43-52, making it the relevant decision for the Court's review. *See Harris v. Thompson*, 698 F.3d 609, 623 (7th Cir. 2012) (citing *Green v. Fisher*, 565 U.S. 34, 40 (2011); *Garth v. Davis*, 470 F.3d 702, 710 (7th Cir. 2006)). As the state court adjudicated Petitioner's claim on the merits, the Court applies the deferential standard set forth by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *Greene*, 565 U.S. at 35.

Under the AEDPA, the Court may not grant habeas relief unless the state court's decision on the merits was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or the state court decision is based on an unreasonable determination of facts. 28 U.S.C. § 2254(d). "The AEDPA's standard is intentionally 'difficult for Petitioner to meet.'" *Woods v. Donald*, 575 U.S. 312, 316 (2015) (per curiam) (quoting *White v. Woodall*, 572 U.S. 415, 419 (2014); *Metrish v. Lancaster*, 569 U.S. 351, 358 (2013)). This "'highly deferential standard [] demands that state-court decisions be given the benefit of the doubt.'"  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)).

The Court applies a "twice-deferential standard" in reviewing the state court's ruling on the sufficiency of the evidence claim. *Parker v. Matthews*, 567 U.S. 37, 43 (2012) (per curiam).

8

First, the Court must be deferential to the verdict. "'[I]t is the responsibility of the [finder of fact] to decide what conclusions should be drawn from evidence admitted at trial.'" *Parker*, 567 U.S. at 43 (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (per curiam)). With this in mind, "[t]he evidence is sufficient to support a conviction whenever, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Parker*, 565 U.S. at 7 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original). Additionally, the Court must accord an additional level of deference required by § 2254(d) under the AEDPA. *Parker*, 567 U.S. at 43 (citing *Cavazos*, 565 U.S. at 2).

The state appellate court's rejection of Petitioner's sufficiency of the evidence claim was neither contrary to, nor an unreasonable application of, clearly established federal law from the Supreme Court of the United States. The state court ruling is not contrary to controlling Supreme Court precedent as the state court identified the correct legal standard. *See Kamlager v. Pollard*, 715 F.3d 1010, 1015 (7th Cir. 2013) (citations omitted) ("A state court decision is 'contrary to' federal law if it applies the wrong legal standard established by Supreme Court precedent or decides a case differently than the Supreme Court on materially indistinguishable facts."); *Direct Appeal*, 2014 IL App (1st) 122942-U, ¶¶ 45 (quoting *Illinois v. Evans*, 808 N.E.2d 939, 947 (Ill. 2004)) ("[W]e 'must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"). That the state court quoted a Supreme Court of Illinois case for the relevant standard is of no moment because the state court is not required to cite to, or even be aware of, the controlling Supreme Court of the United States precedent as long as the state court

judgment does not contradict the controlling Supreme Court case law. *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).[3]

Petitioner also cannot demonstrate the state court decision is an unreasonable application of clearly established federal law. *Kamlager*, 715 F.3d at 1015-16 ("[A] state court decision involves an 'unreasonable application of' federal law if the state court correctly identifies the governing legal principle but unreasonably applies it to the facts of the particular case.") (internal quotation marks and citations omitted).

When viewing the evidence in the light most favorable to the prosecution as required by the sufficiency of the evidence standard, *Jackson*, 443 U.S. at 319, there is extensive evidence supporting Petitioner's conviction. Both Knox and Etheridge identified Petitioner as the shooter. *Direct Appeal*, 2014 IL App (1st) 122942-U, ¶¶ 16, 19. They testified that they were standing with the victim as Petitioner and Q approached and witnessed Petitioner holding a gun. *Id*. Etheridge saw Petitioner fire the gun while Knox heard the gun fired as he fled. *Id*. Miller saw Petitioner running from the scene immediately after the shooting holding an object in his hand. *Id*. at ¶ 18.

Chicago police officers O'Brien and Stanula saw and encountered Petitioner moments after the shots were fired. After O'Brien blocked Petitioner from driving his minivan away from the scene, Petitioner ignored his commands and fled on foot. As Stanula gave chase, Petitioner threw

---

[3] The case cited to by the state court, *Illinois v. Evans*, 808 N.E.2d 939, 947 (Ill. 2004), in turn, cites to *Illinois v. Young*, 538 N.E.2d 461 (Ill. 1989). *Young* cites the controlling Supreme Court standard from *Jackson v. Virginia*, 443 U.S. 307 (1979)). 538 N.E.2d at 472-73. There is no question that the state court in this case arrived at the controlling federal law from *Jackson*. Moreover, it was the Illinois court's prerogative to cite to Illinois cases, instead of the *Jackson* case, in its opinion on Petitioner's claim. *See Johnson v. Williams*, 568 U.S. 289, 300 (citing *Coleman v. Thompson*, 501 U.S. 722, 739 (1991)) ("[F]ederal courts have no authority to impose mandatory opinion-writing standards on state courts.").

a gun over the fence at the ComEd facility. *Id*. at ¶¶ 9, 23. The recovered gun was matched to bullet fragments recovered from the victim's body identifying it as the murder weapon. *Id*. at ¶ 26. There was also gunshot residue on Petitioner's sweatshirt (although not on his hands). *Id*. at ¶ 25. In sum, there is sufficient evidence to support Petitioner's conviction. The state court's rejection of his sufficiency of the evidence argument was neither contrary to, nor an unreasonable application of, clearly established federal law.

Despite the abundant evidence of his guilt, Petitioner argues that the evidence is insufficient because: (1) Knox did not see the shooting but instead heard it as he fled; (2) Etheridge lied to paramedics about his injury and a portion of his trial testimony was inconsistent compared to his grand jury testimony; (3) Miller never witnessed Petitioner shoot the victim; (4) the police officers are lying; and (5) there was no gunshot residue found on his hands and there is no DNA evidence connecting him to the gun. (Dkt. 77, pgs. 7-10.) Petitioner's arguments, however, are an impermissible effort at rearguing the evidence. As mentioned, the evidence is viewed in the light most favorable to the prosecution. *Parker*, 565 U.S. at 7; *Jackson*, 443 U.S. at 319. It is not the Court's place to reweigh evidence or resolve conflicts in witness testimony. *Jackson*, 443 U.S. at 319. The evidence is sufficient to support Petitioner's conviction, and the state court's rejection of this claim is neither contrary to, nor an unreasonable application, of *Jackson*.

In any event, Petitioner's arguments do not hold water. Knox saw Petitioner approach the victim and draw a gun. Knox then heard shooting as he ran, and the victim was later found dead from a gunshot. This is circumstantial evidence supporting Petitioner's guilt, and circumstantial evidence is proper evidence under *Jackson*. 443 U.S. at 324-25 (explaining that circumstantial evidence in record was sufficient to support guilty verdict). Moreover, Etheridge testified that

Petitioner was the shooter, and "[t]estimony of a single eyewitness suffices for conviction even if 20 bishops testify that the eyewitness is a liar.". *Jones v. Butler*, 778 F.3d 575, 582 (7th Cir. 2015) (quoting *Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005)). Moreover, the police officers corroborated that testimony by establishing that Petitioner fled from the scene, attempted to elude the police, and tossed a gun that was later identified through forensic analysis as the murder weapon. The forensic evidence was further buttressed by the presence of gunshot residue on Petitioner's sweatshirt; the absence of residue on his hands is of no moment in view of the expert testimony reporting that firearm residue on the hands can be removed by activity. As for the DNA evidence, its value was not in affirmatively linking Petitioner to the gun but rather in establishing that Petitioner could not be excluded as one of the two to four individuals whose DNA was found on the gun. The state court's rejection of Petitioner's sufficiency of the evidence argument was correct. Consequently, Petitioner cannot demonstrate that the state court ruling was contrary to, or an unreasonable application of, clearly established federal law. Claim One is denied.[4]

---

[4] Petitioner references his actual innocence argument raised in his state successive postconviction petition in his sufficiency of the evidence challenge asserted in Claim One. (Dkt. 1, pg. 5 (citing Exh. C.)) His reply in support of the habeas corpus petition also faults Respondent's answer for failing to address his actual innocence argument within the context of the sufficiency of the evidence claim. (Dkt. 77, pg. 10.) Sufficiency of the evidence and actual innocence, however, are two distinct claims, *see Jones v. Calloway*, 842 F.3d 454, 461-62 (7th Cir. 2016) (quoting *Hayes v. Battaglia*, 403 F.3d 935, 940 (7th Cir. 2005) (Flaum, J., concurring) ("Unlike a review of the sufficiency of the evidence which focuses on whether a rational juror could have convicted, a habeas court considering actual innocence determines whether rational jurors would have convicted.") (emphasis omitted). Petitioner has not raised an actual innocence claim in this case, and he cannot backdoor the claim via a sufficiency of the evidence claim.

Even if the habeas corpus petition is construed as raising a freestanding actual innocence claim in addition to the sufficiency claim, the Court would reject it as meritless. As mentioned, Petitioner's actual innocence claim was denied by the state court in the successive postconviction proceeding, *Galloway*, 2019 IL App (1st) 161592-U, at ¶ 31, resulting in the AEDPA governing the review of the claim in this Court. § 2254(d); *Greene*, 565 U.S. at 35. Whether there is a cognizable freestanding actual innocence claim in a non-death penalty case is an open question

### B.   Claim Two:   Challenge to State Court's Denial of Petitioner's Motion to Suppress Miller's Identification.

Petitioner challenges Xavier Miller's identification of him in a police lineup on October

10, 2009, arguing it was the product of an unduly suggestive police procedure. He brought a

---

that the Supreme Court of the United States has not resolved. *Cal v. Garnett*, 991 F.3d 843, 850-51 (7th Cir. 2021). That dooms the claim under § 2254(d), because the prisoner must show, among other points, that the state court's rejection of his claim violated clearly established federal law from the Supreme Court that was in existence at the time of the relevant state court decision. *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (per curiam).

Moreover, even if the Court could reach the merits, Petitioner would lose. Actual innocence is a demanding standard that requires the prisoner to present new reliable evidence that would show that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. *Blackmon v. Williams*, 823 F.3d 1088, 1101 (7th Cir. 2016). Petitioner presented an affidavit from Anthony Ward claiming he was in a dice game on the evening of the shooting when Etheridge got into a confrontation with a third man, Bernand Hopkins. *Galloway*, 2019 IL App (1st) 161592-U, at ¶ 24. According to Ward, Etheridge pulled out a gun that Hopkins grabbed leading to a struggle between the two men. *Id*. The gun went off during the struggle and Ward claims he ran from the scene. *Id*. Ward claims Petitioner was not present at this incident. *Id*. As the state court recognized when rejecting Petitioner's actual innocence argument, Ward's affidavit does not exculpate Petitioner from Adams's murder. *Id*. at ¶¶ 40-41. Far from it, Ward speaks to Petitioner's alleged absence from a dice game and Etheridge's purported confrontation with Hopkins, but says nothing relevant to Adams's murder. More fundamentally, the affidavit does not contradict the multiple eyewitnesses including the police officers who chased after Petitioner and recovered the murder weapon that he tossed during the pursuit.

13

pretrial motion to suppress the identification that was denied by the state court following an evidentiary hearing. *Direct Appeal*, 2014 IL App (1st) 122942-U, ¶ 12.

A picture from the lineup is below.



(Dkt. 73-1, pg. 10.)

Chicago Police Homicide Detective Gregory Jones, who, along with his partner, conducted the lineup, testified at the pretrial suppression hearing. *Direct Appeal*, 2014 IL App (1st) 122942-

U, ¶ 12. He testified that prior to the lineup, Miller reviewed and signed the Chicago police lineup advisory form explaining that: (1) a suspect may or may not be in the lineup; (2) he was not required to make an identification of an individual in the lineup; and (3) he should not assume that the person administering the lineup knows which person is a suspect. *Id*. at ¶ 13; (Dkt. 73-1, pg. 11.)

Petitioner was one of four individuals in the lineup. According to Detective Jones, the four men were sitting in chairs, and Petitioner, who was allowed to pick his seat, selected seat two. *Direct Appeal*, 2014 IL App (1st) 122942-U, ¶ 12. Petitioner's hair is braided backwards, he has a goatee, he is wearing a white t-shirt, light colored sweatpants, and black gym shoes. (Dkt. 73-1, pg. 10.)

The three other individuals in the lineup were drawn from the Chicago Police Department's 11th District station's lockup. *Id*. Jones's testimony about the lineup participants is consistent with the above picture in the record. *Id*.; (Dkt. 73-1, pg. 10.)

A review of the record shows that the lineup participants were each African American men. (Dkt. 73-1, pg. 10.) The men have the same or substantially similar skin tone, hair color, eye color, hair length, and facial hair. *Id*. The men appeared to be of similar age, height, and weight. *Id*. Any height disparity is lessoned by the fact that they are sitting in chairs. *Id*.

There are, to be sure, differences between Petitioner and the other men in the lineup. The other men each have short hair like Petitioner, but Petitioner is the only man with his hair braided. *Id*. He is also the only man with light colored pants, while the other men are each wearing blue jeans. *Id*. Petitioner is also the only man with black gym shoes. *Id*. Two of the other men appear to have tan colored gym shoes while another man has on tan colored work boots. *Id*. Petitioner,

and one other man, are wearing white t-shirts while one other man is wearing a gray colored long sleeve shirt and the fourth man is wearing a black colored long sleeve shirt. *Id*. Finally, this fourth man has some clothing or other items by his feet while the other three men do not. *Id*. Petitioner and one other man in the lineup have goatees while the other two men have fuller beards. *Id*.

The trial court noticed many of these differences in its ruling but concluded that the lineup was not unduly suggestive when denying Petitioner's motion to suppress. *Direct Appeal*, 2014 IL App (1st) 122942-U, ¶ 12. The state appellate court affirmed the denial on direct appeal, *id*. at ¶ 42, making it the relevant decision for the Court's review. *Harris*, 698 F.3d at 623.

The Constitution's Due Process Clause requires the suppression of an eyewitness identification that is tainted by improper police procedures. *Perry v. New Hampshire*, 565 U.S. 228, 238 (2012) (citing *Manson v. Brathwaite*, 432 U.S. 98 (1977); *Neil v. Biggers*, 409 U.S. 188 (1972)); *see also Sexton v. Beudreaux*, 138 S. Ct. 2555 (2018). There is only a due process concern when the police identification procedure is both "suggestive and unnecessary." *Perry*, 565 U.S. at 238 (citing *Manson*, 432 U.S. at 107, 109; *Biggers*, 409 U.S. at 198); *see also Gregory-Bey v. Hanks*, 332 F.3d 1036, 1045 (7th Cir. 2003) (citing *Foster v. California*, 394 U.S. 440, 442-43 (1969) (emphasis and quotation marks omitted) ("The danger to be avoided in identification procedures is that of orchestrating the procedure so that one particular suspect stands out from the others and the procedure implicitly suggests to the witness that this is the man.").

Even when the police's identification procedure is improperly suggestive and unnecessary, there is no *per se* exclusionary rule requiring suppression of the identification. *Perry*, 565 U.S. at 239. Instead, the identification should only be suppressed when the corrupting effects of law enforcement's improper procedure outweigh the "'indicators of a witness' ability to make an

16

accurate identification.'" *Perry*, 565 U.S. at 239 (quoting *Brathwaite*, 432 U.S. at 114); *see United States v. Griffin*, 493 F.3d 856, 865 (7th Cir. 2007) (explaining this standard is a "two-step approach" of first considering whether the procedures were unduly suggestive and, if so, evaluating whether the identification was nevertheless reliable). "'Reliability of the eyewitness identification is the linchpin' of the evaluation." *Perry*, 565 U.S. at 239 (quoting *Brathwaite*, 432 U.S. at 114). Factors for the Court to consider when evaluating the "witness' 'ability to make an accurate identification'" include: "'the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.'" *Perry*, 565 U.S. at 239 n.5 (quoting *Manson*, 432 U.S. at 114). The Court must engage in a "case-by-case basis" of considering whether the "improper police conduct created a 'substantial likelihood of misidentification.'" *Perry*, 565 U.S. at 239 (quoting *Biggers*, 409 U.S. at 201). This is a "'totality of the circumstances'" approach occurring on a "case-by-case basis" evaluating "whether improper police conduct created a 'substantial likelihood of misidentification.'" *Perry*, 565 U.S. at 239 (quoting *Brathwaite*, 432 U.S. at 110; *Biggers*, 409 U.S at 201).

The state appellate court's rejection of Petitioner's suggestive identification claim was neither contrary to, nor an unreasonable application of, clearly established federal law from the Supreme Court of the United States. The state court ruling is not contrary to controlling Supreme Court precedent as the state court identified the correct legal standard. *Direct Appeal*, 2014 IL App (1st) 122942-U, ¶¶ 38 (quoting *Illinois v. Enis*, 645 N.E.2d 856, 870 (Ill. 1994); *Illinois v. Love*, 878 N.E.2d 789, 794 (Ill. App. Ct. 2007)) (explaining that a "'pretrial identification was

17

impermissibly suggestive" when "it creates 'a very substantial likelihood of misidentification.'"). Again, that the state court quoted Illinois cases for the relevant standard is of no moment because the state court is not required to cite to, or even be aware of, the controlling Supreme Court of the United States precedent as long as the state court judgment does not contradict the controlling Supreme Court case law. *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).

Petitioner also cannot demonstrate that the state court decision is an unreasonable application of clearly established federal law. As mentioned above, the Court's review of the state court's determination is deferential under the AEDPA with the state court being given the "benefit of the doubt." *Cullen*, 563 U.S. at 181. Additionally, the Court is mindful that it is reviewing a state court ruling involving a standard applying a "case-by-case" analysis that is evaluating the totality of the circumstances. *Perry*, 565 U.S. at 239. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

The state court concluded that the lineup was not improperly suggestive.[5] *Id*. at ¶ 42 ("[W]e agree with the trial court that the minor differences identified by defendant did not render the lineup impermissibly suggestive to require its suppression.") The Court cannot say that this determination was an unreasonable application of clearly established law from the Supreme Court.

It is true that looking at the lineup picture, (Dkt. 73-1, pg. 10.) one can find differences between Petitioner and the other three men. Most notably, Petitioner is the only one wearing light colored pants and black shoes. He is also the only one with his hair in braids. The other men in the

---

5 As the state court concluded that the identification was proper, it understandably did not proceed to the second step of evaluating the reliability of the identification.

18

lineup, moreover, also have some distinctive characteristics not shared by the others, a fact that mitigates the significance of Petitioner's differences—that is, the lineup does not consist of one distinct individual posing with a group of three other homogenously appearing men.

These differences are not outcome determinative because a "'lineup of clones is not required'" under the constitutional standard. *United States v. Johnson*, 745 F.3d 227, 230 (7th Cir. 2014) (quoting *United States v. Arrington*, 159 F.3d 1069, 1073 (7th Cir. 1998)). By definition, there will be some differences between the lineup participants (unless they are all identical twins). *United States v. Ford*, 683 F.3d 761, 766 (7th Cir. 2012). Equally, a lineup of completely identical individuals possesses its own issue as the witness would be unable to identify a suspect from the homogenous group of carbon copies. *Johnson*, 745 F.3d at 230; *Ford*, 683 F.3d at 766. The question instead is whether the lineup is unduly suggestive. *Perry*, 565 U.S. at 239.

Looking at the picture taken from the lineup in the record, (Dkt. 73-1, pg. 10.) the Court cannot say that the state court's determination on this point was unreasonable, and so Claim Two is denied. *See Johnson*, 745 F.3d at 230 (holding that photo array was not unduly suggestive because, despite slight differences, there was nothing that made the defendant standout from the others); *Gregory-Bey*, 332 F.3d at 1045 (citing *Foster*, 394 U.S. at 442-43) (explaining unduly suggestive identification procedure is one that is "orchestrat[ed]" by the police to "suggest[] to the witness that this is the man."); *United States v. Traeger*, 289 F.3d 461, 474 (7th Cir. 2002) ("Authorities conducting lineups are required only to make reasonable efforts under the circumstances to conduct a fair and balanced presentation. They are not required to search for

identical twins in age, height, weight, or facial features. [] The fact that the other lineup participants could not pass for [the defendant's] twins did not make the lineup unduly suggestive.").[6]

### C. Claims Three, Four, and Five: Ineffective Assistance of Counsel Arguments

Petitioner raises multiple challenges to the performance of his trial, post-trial, and appellate counsel. Respondent organizes the arguments into Claims Three, Four, and Five (with corresponding subclaims) in the answer, (Dkt. 64, pgs. 9-10.) and Petitioner follows this format in his reply. (Dkt. 77, pgs. 15-31.) The Court follows the structure adopted by the parties.

Claim Three alleges ineffective assistance of trial counsel for failing to: (a) investigate a participant in the lineups viewed by Etheridge (Dkt. 1-2, pgs. 4-8.); (b) move to suppress Etheridge, Miller, and Knox's eyewitness identification based on their trial testimony (*id*. at 8-11); (c) impeach the police officers with their radio transmissions during the foot chase of Petitioner at the motion to suppress hearing (*id* at 11-18); (d) investigate and call an eyewitness to the shooting (*id*. at 18-20); and (e) move to suppress Petitioner's sweatshirt (*id*. at 21-24). Claim Four alleges that post-trial counsel was ineffective for failing to raise trial counsel's purported ineffectiveness in a post-trial motion. *Id*. at 24-26. Finally, Claim Five alleges that appellate counsel was ineffective

---

[6] Additionally, although the state court permissibly terminated its inquiry at the first step finding the lineup was not unnecessarily suggestive, the Court also notes that the identification is also reliable under the second step of the analysis. Miller had an opportunity to view Petitioner, was certain of his identification, and there was a short time lapse between the viewing of Petitioner and the identification. Finally, for arguments sake, even if the Court is wrong and the state court's determination was hypothetically contrary to, or an unreasonable application, of clearly established federal law, the admission of Miller's identification of Petitioner would not have had a substantial and injurious effect on the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). The suppression of Miller's identification of Petitioner does nothing to Knox and Etheridge's eyewitness identification of Petitioner, Officer Stanula's testimony that Petitioner threw the murder weapon over the ComEd facility fence during the police pursuit, the gunshot residue on Petitioner's sweatshirt sleeve, and the forensic evidence identifying the recovered gun as the murder weapon.

for failing to: (a) raise trial counsel's ineffectiveness on appeal; and (b) include a picture of the line-up viewed by Miller as part of the record on direct appeal. *Id*. at 27.

### 1.    Claims 3(d):   Procedural Default

Respondent argues that Claim 3(d), alleging ineffective assistance of trial counsel for failing to investigate and call an eyewitness, is procedurally defaulted because Petitioner failed to properly raise the claim through one full round of state court review as required.[7] (Dkt. 64, pg. 11) "[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process" either on direct appeal or in postconviction proceedings. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *see also Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004). In Illinois, this includes presenting the claims in a PLA to the state supreme court. *Snow v. Pfister*, 880 F.3d 857, 864 (7th Cir. 2018) (citing *Boerckel*, 526 U.S. at 845-46). If the "'federal issue was not fairly presented to the state courts and those courts would now hold the claim procedurally barred,' the procedural

---

[7] Respondent's procedural default argument is limited to challenging Claim 3(d) for failing to fairly present the claim through one complete round of state court review as required. On an unrelated point, the state postconviction trial court held that the ineffective assistance of trial counsel arguments were barred from being raised in the postconviction petition because they could have been raised on direct appeal as they involved matters that were in the record. (Dkt. 65-6, pg. 3.) That ruling could be a ground for a different procedural default argument before this Court. It appears, however, that the postconviction petition raised matters that were outside the record on direct appeal despite the state post-conviction trial court's ruling to the contrary. This Court, however, need not consider whether the state court's ruling on this question "rests on a novel and unforeseeable state-court procedural decision," *Cruz v. Arizona*, 143 S. Ct. 650, 661 (2023), that could undue an otherwise proper adequate and independent state ground of decision, as Respondent does not raise the state court's waiver finding in the procedural default argument. The procedural default raised by Respondent is unrelated to the question of the state court's waiver finding. The Court, therefore, will not consider this question any further.

default doctrine precludes" federal habeas corpus review. *Thomas v. Williams*, 822 F.3d 378, 384 (7th Cir. 2016) (quoting *Ward v. Jenkins*, 613 F.3d 692, 696 (7th Cir. 2010)).

Respondent is correct that the argument is procedurally defaulted. Although Petitioner raised the argument in his postconviction petition, (Dkt. 66-5, pg. 18.) and postconviction appeal, (Dkt. 65-7, pgs. 20-21.) he did not raise it in his postconviction PLA. (Dkt. 65-8.) Thus, the argument is procedurally defaulted.

Neither cause and prejudice nor the fundamental miscarriage of justice doctrines excuse this default. Regarding cause and prejudice, cause is an "'objective factor, external to [Petitioner] that impeded his efforts to raise the claim in an earlier proceeding.'" *Weddington v. Zatecky*, 721 F.3d 456, 465 (7th Cir. 2013) (quoting *Smith v. McKee*, 596 F.3d 374, 382 (7th Cir. 2010)). Examples of cause include: (1) interference by officials making compliance impractical; (2) the factual or legal basis was not reasonably available to counsel; or (3) ineffective assistance of counsel. *Guest v. McCann*, 474 F.3d 926, 930 (7th Cir. 2007) (citing *McCleskey v. Zant*, 499 U.S. 467 (1991)). None of the grounds are available to Petitioner as the failure to raise the argument occurred in a postconviction PLA brought *pro se* by Petitioner.[8]

This leaves the fundamental miscarriage of justice (actual innocence) gateway to excuse Petitioner's defaults. To show actual innocence to defeat a default, Petitioner must demonstrate

---

[8] It is true that Petitioner exhausted other ineffective assistance of counsel arguments in this case. While ineffective assistance of counsel is a single claim, *Pole v. Randolph*, 570 F.3d 922, 934 (7th Cir. 2009) (citing *Peoples v. United States*, 403 F.3d 844, 848 (7th Cir. 2005)), Petitioner must raise the particular factual basis for each aspect of an alleged ineffective assistance of counsel allegation to preserve the respective argument. *Pole*, 570 F.3d at 935 (citing *Stevens v. McBride*, 489 F.3d 883, 894 (7th Cir. 2007)). He did not do that as to this particular ground of alleged ineffective assistance, so this argument is defaulted. *Stevens*, 489 F.3d at 894.

that "'in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013) (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). This is a "demanding" and "seldom met" standard. *McQuiggin*, 569 U.S. at 386 (citing *House v. Bell*, 547 U.S. 518, 538 (2006)). Petitioner must present new, reliable evidence that was not presented at trial—such as exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—to make a credible claim of actual innocence. *House*, 547 U.S. at 537 (citing *Schlup*, 513 U.S. at 324); *see McDonald v. Lemke*, 737 F.3d 476, 483-84 (7th Cir. 2013) (quoting *Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005) ("[A]dequate evidence is 'documentary, biological (DNA), or other powerful evidence: perhaps some non-relative who places him out of the city, with credit card slips, photographs, and phone logs to back up the claim.'")). Petitioner cannot meet this demanding standard as multiple eyewitnesses identified Petitioner as the murderer, he was immediately arrested by the police fleeing from the crime scene, and he was in possession of the murder weapon that he tossed over the fence of the ComEd facility. In sum, Claim 3(d) is procedurally defaulted, and Petitioner cannot excuse the default.

### 2. Claims Three, Four, and Five are Meritless.

Petitioner's remaining ineffective assistance of counsel arguments raised in Claims Three (trial counsel's performance), Four (post-trial counsel's performance), and Five (appellate counsel's performance) are meritless (and his defaulted argument in Claim 3(d) is meritless as well). The state trial court denied Petitioner's ineffective assistance of counsel arguments on the merits. (Dkt. 65-6, pgs. 4-13.) The state appellate court granted Petitioner's postconviction appellate counsel's request to withdraw from the appeal pursuant to *Pennsylvania v. Finley*, 481

23

U.S. 551 (1987), (Dkt. 65-2.) and the state supreme court denied Petitioner's request to bring a PLA. *Galloway*, 167 N.E.3d at 638. The Court "looks through" the state appellate court's *Finley* order to the state trial court's ruling when evaluating Petitioner's arguments. *Wilson v. Sellers*, 138 S. Ct. 1188, 1193, 1195-96 (2018).

*Strickland v. Washington*, 466 U.S. 668 (1984), is the clearly established federal law governing an ineffective assistance of counsel arguments. To demonstrate ineffective assistance of counsel, Petitioner must show both deficient performance and prejudice. *Premo v. Moore*, 562 U.S. 115, 121 (2011) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)). The Court's review of counsel's performance is, itself, deferential under *Strickland*, 466 U.S. at 689 ("a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance"), and applying *Strickland* under the AEDPA (which, as stated above, also requires deference) results in a double level of deference to the state court determination. *Knowles*, 556 U.S. at 123.

Petitioner cannot demonstrate that the state appellate court's rejection of his claim was contrary to, or an unreasonable application of, *Strickland*. The state court correctly identified the controlling *Strickland* standard. (Dkt. 65-6, pg. 4.) ("In examining petitioner's claims of ineffective assistance of counsel, this court follows the familiar two-pronged test of *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Petitioner cannot make an argument that the state employed a standard contrary to *Strickland* in evaluating his ineffective assistance claims.

The state court also reasonably applied *Strickland* when rejecting Petitioner's arguments. "The Supreme Court insists that judges must not examine a lawyer's error (of omission or commission) in isolation." *Williams v. Lemmon*, 557 F.3d 534, 538 (7th Cir. 2009) (per curiam)

(citing *Strickland*, 466 U.S. at 690-96). "It is essential to evaluate the entire course of the defense, because the question is not whether the lawyer's work was error-free, or the best possible approach, or even an average one, but whether the defendant had the 'counsel' of which the sixth amendment speaks." *Id*. A review of trial proceedings as a whole show that trial counsel provided a competent defense of Petitioner.

Defense counsel litigated a number of pretrial matters including a challenge to Petitioner's arrest and seeking to suppress the gun recovered by the police, (Dkt. 65-9, pg. 120.), seeking suppression of Xavier Miller's identification of Petitioner, *Direct Appeal*, 2014 IL App (1st) 122942-U, ¶ 12, pretrial discovery from the prosecution, (Dkt. 65-9, pgs. 73.) seeking to bar the prosecution's introduction of Petitioner's prior crimes at trial, *id*. at 109, moving to bar mentioning that Petitioner requested an attorney, *id*. at 130, barring introduction of the fact that Petitioner was being represented by the Cook County Public Defender, *id*. at 132, preventing mention of Petitioner's purported gang affiliation, *id*. at 134, and barring introduction of the fact that the van Petitioner attempted to flee in after the shooting was stolen. *Id*. at 139. Defense counsel also engaged in extensive examination of the police officers at the motion to suppress pretrial hearings. (Dkt. 65-12.)

At trial, defense counsel presented a coherent theme of the case in opening statements proclaiming Petitioner's innocence and arguing that he did not shoot anyone. (Dkt. 65-14, pg. 15.) He emphasized the chaotic nature of the events that would impact witnesses' ability to make correct identifications, that witnesses changed their stories, and the lack of fingerprints on the recovered gun. *Id*. at 17. During trial, defense counsel attempted to impeach the prosecution's witnesses' credibility through cross-examination. (Dkt. 65-14, pgs. 52-76; pgs. 85-88; pgs. 114-

133.; Dkt. 65-16, pgs. 29-33; pgs. 55-58; pgs. 66-68; pgs. 79-85; pgs. 96-98; pgs. 130-141; pg. 178; pgs. 198-200; Dkt. 65-16, pgs. 16-17; pgs. 30-34; pgs. 56-57.)  Defense counsel's closing argument attacked the credibility of the witnesses presented by the prosecution, raised various questions about the forensic evidence, and sought to diminish the probative weight of Petitioner's flight. (Dkt. 65-16, pgs. 104-134.)  Following the guilty verdict, defense counsel raised a post-trial motion, (Dkt. 65-12, pgs. 110.), raised arguments at sentencing, *id*. at 122, and raised a number of issues on direct appeal. (Dkt. 65-4, pg. 2.) Although defense counsel's efforts were ultimately unsuccessful, when viewing counsel's performance as whole, the record shows competent defense attorneys analyzing the case and implementing a strategy attacking the prosecution's case.

Petitioner also raises individual concerns regarding counsel's performance. Before turning to these individual matters, the Court is mindful that a "single error may suffice" for a *Strickland* violation when it is sufficiently "'egregious and prejudicial,'" *Williams*, 557 F.3d at 538 (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)), but that is the exception to the general rule of viewing counsel's performance as a whole. *Coleman v. Neal*, 990 F.3d 1054, 1056 (7th Cir. 2021) (per curiam) ("*Strickland* says [] that it is the full course of representation that matters. There is a potential exception for a whopper of an error that nullifies all of the good things that counsel did . . . .") (citing 466 U.S. at 690-96; *Williams*, 557 F.3d at 538). However, Petitioner cannot demonstrate a single alleged error is sufficient to demonstrate a *Strickland* violation.

### a.     Claims 3(a):    Failure to Investigate Etheridge and Miller's Lineups.

Claim 3(a) argues that there were constitutional violations in the lineup viewed by Etheridge, and those alleged errors also poisoned the lineup viewed by Miller. (Dkt. 1-2, pgs. 4-8.) Petitioner's pretrial motion to suppress only challenged Miller's lineup identification; no issue

26

as to Etheridge's lineup was raised. *Direct Appeal*, 2014 IL App (1st) 122942-U, ¶¶ 11. In turn, Miller's identification was challenged on direct appeal, while the challenge to the Etheridge identification was raised in the postconviction petition via a claim of ineffective assistance of trial counsel for failing to challenge the Etheridge lineup. (Dkt. 1-2, pgs. 4-8.) The ineffective assistance of trial counsel argument was rejected by the state trial court in the postconviction proceedings, the last reasoned ruling on the merits, and the state appellate court affirmed via appellate counsel's *Finley* motion. (Dkt. 65-2; Dkt. 65-6, pgs. 5-6.) Petitioner now renews the Etheridge lineup claim and the corresponding allegation of its impact on Miller's identification.

Etheridge and Miller identified Petitioner in different lineups. Both lineups occurred at the Chicago Police Department's 11th District station on October 10, 2009. (Dkt. 65-12, pgs. 11-12.) Etheridge's lineup occurred shortly after midnight that morning, while Miller's lineup was later that day around 12:45 p.m. *Id*. Etheridge's lineup consisted of five men, while Miller's consisted of four. *Id*. The picture from Etheridge's lineup is immediately below followed by the Miller line up photo (which was also shown above in the Court's analysis of Claim Two).



(Dkt. 73-1, pg. 13.)



(Dkt. 73-1, pg. 10.)

Petitioner claims that lineup participant number five in Etheridge's lineup, who is to Petitioner's immediate left at the end of the lineup, became angry when told by the police to stand up and step forward during the lineup. (Dkt. 1-2, pg. 5.) According to Petitioner, participant five said "You forced me to be in this lineup, I didn't want to do this, you told me you had your person already, I'm going to sue you if you put some bullshit on me." *Id*. at 6. Petitioner claims he told his trial attorney about this outburst from participant five prior to the filing of the motion challenging Miller's lineup identification, but his attorney failed to take any actions regarding Etheridge's identification. *Id*.

Petitioner speculates, without any evidence, that the outburst by participant five occurred because Etheridge had initially selected participant five, but the outburst caused Etheridge to alter his selection to Petitioner improperly. (Dkt. 1-2, pg. 7.) His speculation continues as he claims Etheridge and Miller were friends and therefore might have spoken after Etheridge's identification, but before Miller's. *Id*. Petitioner believes that Etheridge could have given Miller information about who he identified in the lineup, and the fact that Petitioner is the only person in an all-white outfit in Miller's lineup helped to point to him as the suspect. *Id*.

In rejecting Petitioner's argument, the state trial court began by noting that it previously held that Petitioner's line-up was not unduly suggestive and that holding had been affirmed by the state appellate court. (Dkt. 65-6, pg. 6.) The state court went on to conclude that even if the statement had been made by participant five, the lineup would still not have been unduly suggestive. *Id*. Finally, the state court concluded that there was no prejudice. *Id*. ("For counsel to bring to the court's attention the statements of line up participant No. 5 would not have superseded the abundant amount of eyewitness evidence testimony from Randall Knox, David Etheridge, and Xavier Miller which led to the denial of petitioner's motion and conviction.").

The state trial court misunderstood Petitioner's argument by evaluating the claim within the context of Miller's lineup, not Etheridge's lineup. The state court notes it previously found the lineup was not suggestive and the state appellate court affirmed that ruling, but the lineup considered in the motion to suppress and direct appeal was Miller's lineup, not Etheridge's. In fact, there are only four participants in Miller's lineup—the alleged angry fifth participant is clearly from Etheridge's lineup.

Although neither party recognized this issue, the state court decision is predicated upon an unreasonable determination of fact, 28 U.S.C. § 2254(d)(2), namely that the state court misunderstood that the alleged outburst occurred in Etheridge's lineup, not Miller's. An unreasonable determination of the facts is one that ignores the clear and convincing weight of the evidence and is "'so inadequately supported by the record as to be arbitrary and therefore objectively unreasonable.'" *Alston v. Smith*, 840 F.3d 363, 370 (7th Cir. 2016) (quoting *Ward v. Smith*, 334 F.3d 696, 704 (7th Cir. 2016)). The record is clear that Petitioner is claiming the outburst by participant five occurred in Etheridge's lineup, yet the state court analyzed the claim as an alleged outburst occurring in Miller's lineup.

Despite the state court's unreasonable determination of fact under § 2254(d)(2), the Court must still evaluate Petitioner's claim under § 2254(a). *Brown v. Davenport*, 142 S. Ct. 1510, 1524 (2022); *Mosley v. Atchison*, 689 F.3d 838, 853 (7th Cir. 2012). Although the state court's ruling is no longer afforded deference under the AEDPA, and this Court must therefore conduct a *de novo* review, the state court correctly rejected Petitioner's claim.

Turning to the first prong of *Strickland* evaluating counsel's performance, defense counsel had the duty to either investigate Petitioner's allegations regarding participant five's outburst and coordination between Etheridge and Miller, or make a reasonable decision that an investigation was unnecessary. *Strickland*, 466 U.S. at 691. Petitioner claims he told his attorney about these allegations, but the attorney took no actions. Thus, the defense attorney's decision to allegedly not take any further action "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment." *Id*. An attorney is not required to pursue every suggestion from a client. She may "avoid activities that appear 'distractive from more

31

important duties.'" *Harrington v. Richter*, 562 U.S. 86, 107 (2011) (quoting *Bobby v. Van Hook*, 558 U.S. 4, 11 (2009) (per curiam)). She is also under no obligation to raise a losing argument. *Whitehead v. Cowan*, 263 F.3d 708, 731 (7th Cir. 2001).

Petitioner's attorney's alleged failure to follow up on these allegations was reasonable. Petitioner believes that participant five's alleged outburst was due to Etheridge first identifying him as the offender. This raises the question of how Petitioner knew what Etheridge said during the lineup as presumably he was shielded from the lineup participants. Petitioner provides no basis here—and does not maintain that he provided any to his trial counsel—to support his contention that Etheridge initially selected participant five as the shooter. Counsel's performance cannot be deemed constitutionally deficient by virtue of failing to act on the basis of Petitioner's mere speculation that Etheridge changed his pick after participant five's outburst.

There is, moreover, a logical link missing between participant five's purported outburst and Petitioner's identification by Etheridge. According to Petitioner, participant five said "You forced me to be in this lineup, I didn't want to do this, you told me you had your person already, I'm going to sue you if you put some bullshit on me." (Dkt. 1-2, pg. 5.) Participant five's alleged statement does nothing to suggest that Petitioner should be selected in his place or for that matter that the suspect was in the lineup. At most, participant five is effectively saying "don't pick me," but that would leave four other men in the lineup. Petitioner fails to explain how Etheridge allegedly settled on him over the other three remaining men. And certainly nothing suggests that the police orchestrated this alleged outburst from participant five or steered Etheridge towards picking Petitioner. *See Gregory-Bey*, 332 F.3d at 1045 (citing *Foster*, 394 U.S. at 442-43) (explaining unduly suggestive identification procedure is one that is "orchestrat[ed]" by the police

32

to "suggest[] to the witness that this is the man."). A lineup participant saying, "I'm not the man," is different than the police suggesting to the witness, "this is the man."[9]

Moving to Miller's lineup, Petitioner suggests it is possible that Etheridge and Miller spoke after Etheridge's lineup to help coach Miller into identifying Petitioner. Again, there is no evidence to support this speculation. A prisoner's self-serving statements or speculation is not enough to meet the *Strickland* standard. *Julian v. Bartley*, 495 F.3d 487, 499-500 (7th Cir. 2007). Petitioner provides no evidence suggesting police misconduct making either lineup unduly suggestive. His defense attorney could reasonably choose to not pursue this line of argument.

Additionally, Petitioner's attorney was reasonable to not pursue this line of inquiry as Etheridge's and Miller's identifications of Petitioner were reliable when considering the relevant factors. *Perry*, 565 U.S. at 239 n.5 (quoting *Manson*, 432 U.S. at 114)). As discussed above in Claim Two, Miller's identification has the hallmark of reliability, and Etheridge's has as well. Etheridge testified that Petitioner walked directly up to him and the victim, he had an extensive period to observe Petitioner, and he was certain about his identification.

Petitioner also fails to demonstrate prejudice under *Strickland*. Even if Petitioner had successfully suppressed Etheridge's and Miller's identifications, Knox's identification remains unaffected. Knox was in the group with the victim and Etheridge when Petitioner approached and drew his gun. Although Knox turned and fled, he immediately heard a gunshot. Additionally, there is the testimony from the police officers who apprehended Petitioner and recovered the murder

---

[9] Petitioner also makes a reference in challenging the composition of the lineup participants in Etheridge's lineup. Viewing the picture from the lineup, the Court concludes that there is no evidence that the lineup was unduly suggestive. *Johnson*, 745 F.3d at 230.

weapon that Petitioner discarded during the chase. Petitioner cannot demonstrate a reasonable probability that, but for counsel's alleged unprofessional errors, the result of the proceedings would have been different. *Strickland*, 466 U.S. at 694. Accordingly, Claim 3(a) is denied.

> **b.   Claim 3(b):   Counsel's Failure to move to suppress Etheridge's, Miller's, and Knox's Eyewitness Identifications.**

Petitioner argues in Claim 3(b) that Etheridge's, Miller's, and Knox's trial testimony demonstrates that they lied about the events of the murder, and in turn, that their eyewitness identifications were fraudulent. (Dkt. 1, pgs. 8-11.) He further claims that his defense attorney should have called them as witnesses during the suppression hearing or alternatively sought reconsideration of the motion to suppress their identifications in a post-trial motion. *Id*. He also believes his attorney should have called participant five from the Etheridge lineup in support of this line of argument. As these arguments were resolved by the state trial court in the postconviction proceeding, (Dkt. 65-6, pgs. 5-9.), they are governed by the AEDPA standard before this Court. *Greene*, 565 U.S. at 35.

Petitioner's arguments regarding Etheridge, Miller, and Knox demonstrate a misunderstanding of the relevant legal standard. As discussed above, an identification should only be suppressed if: (1) it is the product of an unnecessarily suggestive police procedure; and (2) the resulting identification is unreliable. *Perry*, 565 U.S. at 238-39. Petitioner's belief that they were unreliable witnesses is insufficient, by itself, to require suppression of their eyewitness identifications when there was no finding of an unnecessarily suggestive police procedure in this case. *Id*. at 245 ("The fallibility of eyewitness evidence does not, without the taint of improper state conduct, warrant a due process rule requiring a trial court to screen such evidence for

34

reliability before allowing the jury to assess its creditworthiness."). The question of the credibility of Etheridge's, Miller's, and Knox's identifications of Petitioner as the shooter was correctly left to the jury because the "jury, not the judge, traditionally determines the reliability of evidence." *Perry*, 565 U.S. at 246. Petitioner's argument on this point is a losing argument, and his attorney cannot be faulted for failing to raise it. *Whitehead*, 263 F.3d at 731.

As for Petitioner's other argument, as discussed in Claim 3(a), Petitioner cannot demonstrate an error in the Etheridge lineup even if participant five did disrupt the lineup as he alleges. As such, there is no error in failing to call participant five to testify regarding the alleged disruption.

In sum, Petitioner's arguments are meritless, and so the state court's rejections of them are not an unreasonable application of *Strickland*. Claim 3(b) is denied.

c.      **Claim 3(c):    Counsel's Failure to Impeach the Police Officers with their Radio Transmissions during the Foot Chase at the Suppression Hearing.**

Petitioner next argues that his trial counsel was ineffective for failing to impeach Officers O'Brien and Stanula at the suppression hearing.[10] (Dkt. 1-1, pgs. 11-18.) Prior to trial, defense counsel moved to quash Petitioner's arrest and suppress the introduction of the recovered gun under the Fourth Amendment. *Direct Appeal*, 2014 IL App (1st) 122942-U, ¶¶ 30-33. Following an evidentiary hearing where Officers O'Brien and Stanula testified, the trial court denied the motion to suppress. *Id*. at ¶ 10. The state appellate court on direct appeal affirmed the denial of the

---

[10] Petitioner's argument focuses on defense counsel's alleged failure to impeach the officers at the suppression hearing. He does not extend the argument to the officers' trial testimony. Regardless, that argument would also be meritless for the same reasons.

motion holding that Petitioner's case was controlled by *California v. Hodari D.*, 499 U.S. 621 (1991). *Direct Appeal*, 2014 IL App (1st) 122942-U, ¶¶ 30-33.

    *Hodari D.* holds that a person is seized for Fourth Amendment purposes when there is either an application of physical force by the police officer against the person with intent to restrain or the person submits to the officer's show of authority. *Torres v. Madrid*, 141 S. Ct. 989, 995 (2021) (citing *Hodari D.*, 499 U.S. at 626). There is no seizure when the suspect is in the process of fleeing from the police. *Hodari D.*, 499 U.S. at 626. Equally, evidence abandoned by the suspect while fleeing is not considered fruit of the seizure because no seizure has occurred while a chase is underway. *Id.* at 629 ("In sum, assuming that Pertoso's pursuit in the present case constituted a 'show of authority' enjoining Hodari to halt, since Hodari did not comply with that injunction he was not seized until he was tackled. The cocaine abandoned while he was running was in this case not the fruit of a seizure, and his motion to exclude evidence of it was properly denied."). The state appellate court on direct appeal applied these principles explaining "defendant did not comply but rather continued to flee. Without evidence of a Fourth Amendment seizure, the circuit court properly denied defendant's motion." *Direct Appeal*, 2014 IL App (1st) 122942-U, ¶ 33.

    In his postconviction petition, Petitioner argued that his attorney was ineffective for failing to impeach Officers O'Brien and Stanula with their radio transmissions during the foot chase. He also attached the police department's summary of the radio transmissions to his postconviction petition. (Dkt. 65-5, pgs. 38-47.) Petitioner's view is that the transmissions show that the officers were lying in their testimony. The state trial court denied Petitioner's argument under *Strickland* concluding that the Petitioner was not prejudiced by the failure to present the radio transmission records because of the "voluminous amount of eyewitness and forensic evidence presented against

36

Petitioner." (Dkt. 65-6, pg. 11.) Petitioner now renews this argument in his instant habeas corpus petition.[11] (Dkt. 1-2, pgs. 11-18.)

The Court rejects Petitioner's argument concluding that the state court's decision was not an unreasonable application of *Strickland*. Although the trial court based its ruling on *Strickland* prejudice's prong, the Court notes that there is no evidence that counsel was deficient in failing to pursue the police radio transmission records. Contrary to Petitioner's view, the records are consistent with the officers' testimony of responding to shots being fired, chasing an individual in a sweatshirt, the individual jumping out of a van and fleeing and being arrested by Orr High School, and a handgun being recovered. (*Id*.) Beyond the general consistency of the radio transmissions with the testimony of O'Brien and Stanula (which was reason enough for trial counsel to have decided not to try to impeach the officers with the radio calls), the purported impeachment on which Petitioner rests his claim warranted little weight. He "assumes" that the radio records show that while Stanula was chasing and apprehending Petitioner, O'Brien was actually chasing someone else who got away.[12] Even if true, that an unknown suspect got away

---

[11] Petitioner may raise this argument pursuant to *Strickland* without running afoul of *Stone v. Powell*, 428 U.S. 465 (1976). *See Kimmelman v. Morrison*, 477 U.S. 365, 383 (1986); *Owens v. United States*, 387 F.3d 607, 609 (7th Cir. 2004).

[12] It bears noting that the purported inconsistencies Petitioner identifies are predicated on his assumption that transmissions by "PD40" were from O'Brien and those from "PD41" were Stanula's transmissions. See Dkt. 65-5 at 14 ("It would be reasonable to associate Officer Stanula with PD41 … [and to] associate Officer O'Brien with PD40"). But it is not reasonable to jump to that conclusion; some of the entries demonstrate that the opposite is true—namely that Stanula is PD40 and O'Brien is PD41. O'Brien testified that he transmitted the first description of the suspect and the radio calls reflect that the first description was transmitted by "PD41." So, too, was the transmission reporting that the suspect "jumped out of the van"; that was an event that O'Brien, not Stanula, witnessed, Petitioner's trial counsel did not render ineffective assistance by failing to impeach the officers' accounts of what happened on the basis of Petitioner's unsubstantiated and seemingly erroneous interpretation of their radio calls.

37

from O'Brien would be of little help to Petitioner, as that fact would do nothing to undermine the evidence that Stanula chased and arrested Petitioner after he tossed a gun during the pursuit. The records tendered by Petitioner with his postconviction petition do not support his position that the officers lied during their testimony. Defense counsel cannot be faulted for failing to present these records in the pretrial suppression hearing.[13] *Whitehead*, 263 F.3d at 731.

Moving on, the state court also did not unreasonably apply *Strickland's* prejudice prong, either. To demonstrate prejudice for counsel's alleged deficient performance for failing to raise a Fourth Amendment claim, Petitioner must show both: (1) the Fourth Amendment claim is meritorious; and (2) a reasonable probability that the verdict would have been different absent the excluded evidence. *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986).

Petitioner cannot demonstrate a meritorious Fourth Amendment claim. As the state court correctly held, Petitioner was not seized for purposes of the Fourth Amendment while fleeing from the police, and in turn, the gun he abandoned during the pursuit was not subject to suppression. *Hodari D.*, 499 U.S. at 626. Additionally, there was also probable cause for his subsequent arrest once the police caught up to him. Petitioner's flight from the police immediately after the police heard the gunshots plus his tossing the gun over the fence of the ComEd facility to avoid having the gun on his person provided probable cause for the arrest. *United States v. Wilson*, 963 F.3d

---

[13] A consistent theme of Petitioner's case is that the witnesses against him are lying. This argument is another example; Petitioner claims that the officers intentionally lied during their testimony, "fabricating their stories to make it seem as if it were the petitioner that ran to and from a van, and threw a gun." Dkt. 65-5 at 18. As explained above, however, state court factual findings have a presumption of correctness, The testimony from the witnesses against Petitioner, including the police officers, was accepted by the state court at the pretrial suppression hearing and at the jury at trial. In relying on the radio transmissions, Petitioner falls well short of rebutting this presumption by clear and convincing evidence. 28 U.S.C § 2254(e)(1); *Tharpe v. Sellers*, 138 S. Ct. at 548; *Hartsfield*, 949 F.3d at 309.

701, 704 (7th Cir. 2020) (citing *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)). Finally, the trial court is further correct that the multiple eyewitnesses, who are independent of any Fourth Amendment challenge, are sufficient to demonstrate a lack of prejudice. The state court's rejection of this argument is not an unreasonable application of *Strickland*. Claim 3(c) is denied.

**d.    Claim 3(d):    Counsel's Failure to Investigate and Call an Unnamed Witness.**

Petitioner faults his attorney for failing to investigate and call a female eyewitness to the shooting. (Dkt. 1-2, pgs. 18-20.) In addition to being procedurally defaulted, this argument is also meritless.

According to Petitioner, the witness is identified in the police reports, but the report is not included in the record. As the state court noted when rejecting the argument, Petitioner fails to show that the witness was both available to testify and had evidence that supported Petitioner. (Dkt. 65-6, pg. 7.) The Court agrees with this assessment. Petitioner's instant argument consists of identifying this potential witness and then jumping to the unsupported conclusion that she is the key witness that would win the case for him.

The state court's application of *Strickland* on this point was correct, and therefore, Petitioner cannot demonstrate an unreasonable application. Petitioner has the burden under *Strickland*. 466 U.S. at 693; *see also United States ex rel. Cross v. DeRobertis*, 811 F.3d 1008, 1017 (7th Cir. 1987) ("Therefore, if the potential witnesses are not called, it is incumbent on the petitioner to explain their absence and to demonstrate, with some precision, the content of the testimony they would have given at trial."). The lack of evidence regarding what this potential witness's testimony would have been is sufficient to support the state's rejection of this argument.

39

Additionally, as has been discussed throughout this opinion, the evidence of Petitioner's guilt is overwhelming, preventing him from demonstrating prejudice under *Strickland*. Assuming *arguendo* that the witness is favorable to Petitioner as he claims, this does nothing to undermine the fact that multiple eyewitnesses identified him as the shooter, Petitioner abandoned the murder weapon while being chased by the police and gunpowder residue was found on his sweatshirt. The state court's rejection of this argument is not an unreasonable application of *Strickland*. Claim 3(d) is denied.

### e.  Claim 3(e):  Counsel's Failure to Challenge Chain of Custody for the Sweatshirt.

Petitioner alleges a defect in the chain of custody for his seized sweatshirt that contained the gunshot residue. He alleges his trial counsel was ineffective for failing to raise this issue. (Dkt. 1-2, pgs. 21-23.) The state court rejected this argument, explaining that the prosecution presented sufficient foundation at trial to make the sweatshirt admissible regardless of any chain of custody concerns. (Dkt. 65-6, pg. 11.) Additionally, according to the state court, any concerns regarding the sweatshirt were irrelevant as the overwhelming nature of the evidence supporting Petitioner's guilt, so he could not demonstrate *Strickland* prejudice regardless of the outcome of any chain of custody issue. *Id*. at 12.

Under Illinois law, when the prosecution seeks to introduce an object into evidence, there must be sufficient foundation presented either via witness identification of the object or by establishing a chain of custody. *Illinois v. Postlewaite*, 2023 IL App (4th) 221027-U, ¶ 36 (citing *Illinois v. Woods*, 828 N.E 247, 254 (Ill. 2005)). The type of evidence determines the necessary foundation. *Id*. Uniquely identifiable items that are not subject to change can have foundation

established by eyewitness testimony, while ubiquitous items that are subject to tampering or contamination must have foundation established by chain of custody. *Id*.

The problem for Petitioner in challenging the state court's ruling on this issue is that foundation and chain of custody are questions of Illinois state evidentiary law. *Herndon v. Dorethy*, No. 17 C 4356, 2020 WL 777249, at *3 (N.D. Ill. Feb. 18, 2020). This Court is bound by a state court's interpretation of state law. *Harper v. Brown*, 865 F.3d 857, 859 (7th Cir. 2017) ("[H]is argument is really an attack on the state court's resolution of a question of state law embedded within its analysis of a *Strickland* claim. Federal courts are not empowered to review questions of state law under § 2254.") (emphasis omitted).

With the state court's ruling that the sweatshirt was admissible and that there was no chain of custody concern, defense counsel was not deficient for failing to raise this losing argument. *Whitehead*, 263 F.3d at 731. Moreover, as the state court noted, the evidence of Petitioner's guilt was overwhelming, meaning there was no prejudice on the issue. As such, the state court's rejection of the argument was not an unreasonable application of *Strickland*. Claim 3(e) is denied.

### 3. Claims Four and Five: Ineffective Assistance of Post-Trial and Appellate Counsel

Building upon the arguments challenging trial counsel's performance raised in Claim Three, Petitioner alleges his post-trial attorney should have raised these issues of trial counsel's ineffectiveness in a post-trial motion (Claim Four), and that his appellate counsel similarly failed him by neglecting to raise them on direct appeal (Claim Five). The state trial court rejected these arguments, noting that the underlying ineffective assistance of counsel arguments were meritless, and so a subsequent attorney could not be faulted for failing to raise the ineffective assistance of counsel issue in a later motion or appeal. (Dkt. 65-6, pg. 13.) The state court's application of

41

*Strickland* is correct, as an attorney cannot be faulted for failing to raise a losing argument. *Whitehead*, 263 F.3d at 731.

Finally, Petitioner faults his appellate attorney for failing to include a picture of the lineup viewed by Miller on direct appeal. Even if he should have done so, that failure did not prejudice Petitioner because the picture, which is in the record before this Court, demonstrates that the lineup was not unduly suggestive as discussed in the Court's rejection of Claim Two. (Indeed, that may have been why Petitioner's appellate counsel did not include it in the appellate record, preferring to selectively focus the appellate court only on the points included in a written submission.) The state court's rejection of these arguments is not an unreasonable application of *Strickland*. Claims Four and Five are denied.

### D. Claim Six: Sentencing Challenge

Petitioner's final argument is that his sentence was enhanced for personally discharging the firearm during the offense that resulted in the death of the victim. (Dkt. 1-2, pgs. 28-32.) He alleges a violation of *Alleyene v. United States*, 570 U.S. 99 (2013), on this point. *Alleyene* is an application of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), 570 U.S. at 103, so Petitioner is actually raising an *Apprendi* claim. The rule of *Apprendi* is that a fact, other than a prior conviction, that increases the maximum penalty for a crime must be charged in the indictment, submitted to the jury, and proven beyond a reasonable doubt. 530 U.S. at 476. Petitioner argues that the *Apprendi* rule was not complied with in his case. The state court rejected this claim, explaining that the allegation that he personally fired the gun was charged in the indictment and found by the jury beyond a reasonable doubt. (Dkt. 65-6, pg. 13.)

Petitioner's claim that the jury did not find that he personally discharged a firearm during the murder of Adams and the attempt murder of Etheridge is simply wrong. As the state court correctly noted, the fact of Petitioner personally discharging the weapon that killed the victim was charged in the indictment, (Dkt. 65-9, pgs. 34-68), the jury was instructed on this point, *id*. at 168, and the jury found that fact beyond reasonable doubt. *Id*. at 176 (Special Verdict form). *Apprendi* was complied with in this case. The state court decision is neither contrary to, nor an unreasonable application of, *Apprendi*.[14] Claim Six is denied. The habeas corpus petition is denied.

### III.    Notice of Appeal Rights and Certificate of Appealability

Petitioner is advised that this is a final decision ending his case in this Court. If he wishes to appeal, he must file a notice of appeal with this Court within 30 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). Petitioner need not bring a motion to reconsider this Court's ruling to preserve his appellate rights. However, if he wishes the Court to reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment. *See* Fed. R. Civ. P. 59(e). The time to file a motion pursuant to Rule 59(e) cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv). Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of

---

[14]  Beyond the fact that *Apprendi* was complied with in this case, the Court further notes that any theoretical error would not have had a substantial and injurious effect in this case. *Brecht*, 507 U.S. at 637. Multiple eyewitnesses testified to Petitioner personally discharging the weapon that killed the victim. Petitioner was in possession of the murder weapon immediately after the shooting while being chased by the police and had gunpowder residue on the sweatshirt he was wearing.

the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi).

The Court declines to issue a certificate of appealability. Petitioner cannot make a substantial showing of the denial of a constitutional right, and reasonable jurists would not debate, much less disagree, with this Court's resolution of Petitioner's claims. *Arredondo v. Huibregtse*, 542 F.3d 1155, 1165 (7th Cir. 2008) (citing 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).

## IV. Conclusion

Petitioner's habeas corpus petition (Dkt. 1, 13.) is denied on the merits. Any other pending motions are denied as moot. The Court declines to issue a certificate of appealability. The Clerk is instructed to: (1) terminate Respondent Lashbrook, (2) add David Mitchell, Warden, Pinckneyville Correctional Center as Respondent; (3) alter the case caption to *Galloway v. Mitchell*; and (4) enter a Rule 58 judgment in favor of Respondent and against Petitioner. Civil case terminated.

ENTERED:

Dated: September 1, 2023

JOHN J. THARP, JR.
United States District Judge

44